# Exhibit "A"



# Exhibit "B"




Articles   Podcasts   Videos   Blogs   Current Issue   Español   Store   Your Account

President's Desk   John's Bailiwick   Shot Craft   TheFilmBook   Parallax View   Filmmaker's Forum




# Pilobolus: From Jock Goof-offs to the Oscars, and Beyond

November 18, 2009   John Bailey, ASC





Here is a photo of Pilobolus:



Pilobolus roridus

Oops, sorry. *That* Pilobolus is a spore-spewing fungus, studied by mycologists, that thrives in cow manure. Here is a photo of *our* Pilobolus. They dance. Well, not all their critics exactly describe it as dance:

Their first gig was as opening act for a Frank Zappa concert; they named themselves after a relative of bread mold. They started to work together in a student dance class, but they were non-dancers. After almost 40 years of performances, they still have no choreographer; the dancers make it up among themselves.

Pilobolus is such an anomaly in the world of contemporary dance that the

esteemed dance critic of the *New Yorker*, Arlene Croce, doesn't even call them a dance company but an "acrobatic mime troupe." Jean Morrison Brown in the book *Vision of Modern Dance* quotes one of the four founding members, Moses Pendleton: "We felt that maybe we couldn't dance, so why try to? When we began we didn't really feel free, moving in space individually. We literally had to hang on to each other…. It wasn't so difficult if you did create this shape, a thing that moved…. We began to play around by combining bodies."

This combining of bodies is unlike what any dance company had ever done or what the rarefied world of modern dance had ever seen. And since the four guys who started it had little sense of the airy space of classical dance history or of ballet, they followed their sense of locker room physicality and mixed it up like a rugby scrum or a football pile-up in the end zone. Here are two images of this "combining."





Four guys: Robby Barnett, Jonathan Wolken, Michael Tracy, and the above-quoted Moses Pendelton enrolled in 1970 in a Dartmouth student dance class taught by Alison Chase, herself only 24. She says they thought it would be an easy "A." Journalist Rebecca Leung in conversation with Chase in 2006 for a *60 Minutes* profile asks her about the beginning:

*What was it like to try to teach these guys how to dance? "That was a relative disaster. So I struck out in another direction, and I taught them how to make dances," says Chase. "It was a little bit like just giving us finger paints," says*

Barnett. "We were given some materials, like us. And we fooled around and figured out what we could do."

What they found they could do was glom onto one another. "You know the idea of standing alone in front of people was impossible," says Barnett. "So we kind of clung to each other for moral as well as physical support."

They named this dance Pilobolus—and it was videotaped at a showcase for student dances. They had been at it only two semesters. "We managed to combine our bodies, climb over each other, flip, swing, fly, lift, flop each other around in different ways," says Wolken. The student showcase led to a full-fledged show in New York, which got a great review in The New York Times, and the attention of Charles Reinhart, the director of the prestigious American Dance Festival.

Lesley Stahl begins a June 2006, *60 Minutes* profile by asking Reinhart about Pilobolus' appearance at American Dance Festival. What ensues is a capsule history of the group, with brief archived shots from their earliest work, and Stahl getting a hands-on demonstration from the group:

I first saw *Pilobolus* in the winter of 1984 in Santa Fe where I was photographing the western *Silverado*, and then subsequently during their annual two-week summer residences at the Joyce Theater in Chelsea, NYC. Their work is in constant *morphosis* year to year, their pieces ever-expanding in scale and complexity. As they do so, they leave behind whatever vestigial sense of most modern dance they might once have had.

In 2004, they created a dance called *Megawatt*. Large parts of it are performed on or very near the stage floor, almost as if they are the eponymous fungi struggling upward through earth to air. Here is a video of excerpts. The music is by Primus and Radiohead:

It's easy to understand that any traditional way of talking about "dance" does not apply to the six artists who make up the core company. The fact that they, from the beginning, have lived in a community, much like Japanese Butoh dancers and the drumming group, Kodo, helps explain the intricate movement symbiosis required. When fully upright, wrapped and wound around each other like a vine with aerial roots, their term "weight-sharing" becomes clear. In order to discuss with each other whatever ideas they have as the piece is evolving in their studio, they had to invent their own vocabulary such as: "galloping sofas," "fat gnomes," "flogs," "dolphin," "body floss." That vocabulary must be in constant expansion as newer moves are developed. As the company grew in ambition the core body of dancers sometimes expanded. But in February of 2005 at the TED conference in Monterey, California, a two-person piece was performed that distilled all their athleticism, organic evolution of body and near-metaphysical religiosity into a single 15-minute piece called *Symbiosis*. Its elemental, reductive qualities, along with the severe purity of the music of George Crumb and Arvo Part, demonstrates why this group had become a staple of the high-end artistic patrons of modern dance. It is a long way from the antics and acrobatic hi-jinks of their early years on the Dartmouth campus, to here:

Almost every style/technique in dance, from the 19th century Russian ballet of Petipa and Fokine, to Balanchine and Graham, Tharp and Fosse, depends on some codified set of moves and gestures that act as transitions from one section of a piece to the next. This is most apparent in classical ballet and its 20th and 21st century traditional siblings. But a piece like *Symbiosis* defies the history of what we think of as classical *pas de deux*. These two superbly trained bodies merge at times into one. The high point of most ballet, even much contemporary dance, is the elevation or lift of the female partner with the male as supporting ground. This is not the style of Pilobolus.

Even as Pilobolus' reputation reached its seeming apogee a few years ago, it took an unexpected turn that surprised and even dismayed some of its most fervent supporters. It may have even been the real reason why Alison Chase

later Pilobolus, after almost 50 years of what happened, with that full indicated, is that in the eyes of some Pilobolus followers—they went HOLLYWOOD; the company was featured on the 79th Oscar presentation doing shadow renderings behind a screen of that year's films. The least said about that, the better.

However, after the Oscar telecast, Pilobolus, in an all too predictable twist, was inundated with over 3000 job offers, most of them of a commercial nature. This new direction filled their coffers, allowed the company to expand its teaching programs and expand its touring company. And as often can be the case, some of the commercial work did allow for a new creative platform.

Here is a behind-the-scenes video of the making of the "human car" commercial for Ford Canada. Matt Kent and Jonathan Wolken of Pilobolus are present to work with director Jorn Threlfall and cinematographer Ian Foster on the intricate choreography of dancers, props (car parts) and camera:

Here is the completed commercial:

Somewhere around this time, Pilobolus' inchoate and experimental ideas for doing pieces behind a screen as "shadowplays" were embraced by commercial clients, some of whom may have seen the close, organic and even erotic intertwinings of these near nude bodies as too explicit for television marketing. But shadows and light play had been a visual element in some earlier pieces; I remember one that I saw in Santa Fe that had involved flashlights with light beams casting racing shadows against a stage scrim.

The idea of using the company for car commercials seems to have caught fire. Here is one they did for Hyundai:

It was only a matter of time before Pilobolus ended up on late night television. Here they are on Conan O'Brien's show, taped during their July 2008 residence at the Joyce Theater. There are obvious elements inserted just for the program that show a pandering to mainstream Broadway style and taste:

This never-ending debate about art vs. commerce, integrity versus selling-out, is a bit passé at a time when no one even agrees that an avant-garde continues to exist, or when the move from off-off Broadway to Tony Awards can happen in a single season.

But all this commercial work does seem to have enriched the company's ideas of shadow theater in a way that evokes an almost proto-cinema tone. There is a full narrative developed in this next video, told simply and in real time, the figures moving across the screen as they could have done against the cave walls of early man, shadows cast by flickering fire light:

This work also reminds me of cinema's oldest surviving feature animated film, one I saw in my very first month at USC as a film student: *The Adventures of Prince Achmed*, completed in 1926 by Lotte Reiniger, whose use of multi-plane technique anticipated Walt Disney and Ub Iwerks by a full decade:





The story of Reiniger's uncompromising odyssey in the creation of silhouette cinema can be found here:

Wikipedia.org article link

Here is the first act of *The Adventures of Prince Achmed*. After an introduction of characters and some prologue, the Prince is introduced six minutes in:

An old but absolutely fascinating documentary traces the development of Reiniger's films—from sketches and cutouts to camera animation. There is a wonderful moment early on when Reiniger suggests that if you don't happen to have an animation table in your home you can easily cut a hole in the dining room table and cover it with a white sheet:

www.dailymotion.com video link

It will be of real interest to see how Pilobolus develops from here. I wish them the best in whatever cutting edge endeavors they yet undertake. In American culture, the arc from creative genesis to pop culture fame is not always a good one. Like the stock market, as we too well know, the high point can just precede the crash—and that can land us back in the dung pile.

Tagged:



## Read More


**JOHN'S BAILIWICK**
Inside Covid-19 in Cremona with Sasha Joelle Achilli


**JOHN'S BAILIWICK**
Samuel Beckett: Still Waiting for Godot


**JOHN'S BAILIWICK**
Nomenklatura of Signs: Alexey Titarenko


**JOHN'S BAILIWICK**
The Pipa and the Kamancheh

### Subscribe Today

Act now to receive 12 issues of the award-winning AC magazine — the world's finest cinematography resource.

[Print Edition] [Digital Edition]





**Newsletter**

**Connect**

©2020 American Society of Cinematographers   Terms of Use   Privacy Policy

Contact   Advertising   FAQ

# Exhibit "C"

Law Offices of
# GREG S. BERNSTEIN
A Professional Corporation

301 N. Canon Drive, Suite 318
Beverly Hills, California 90210-4726
Telephone: (310) 247-2790
Facsimile: (310) 247-2791
Internet: www.thefilmlaw.com

GSB Client File:
American Society of Cinematographers

**GREG S. BERNSTEIN**
Direct Dial: (310) 247-2799
E-mail: greg@thefilmlaw.com

August 25, 2020

**<u>VIA EMAIL</u>**

Higbee & Associates
Attn: Josh Cannon
1504 Brookhollow Dr., Suite 112
Santa Ana, CA 92705

  Re: American Society of Cinematographers - Claim Number: 556297

Dear Mr. Cannon:

  This office represents the American Society of Cinematographers (the "ASC").

  Your letter and emails to the ASC concerning the above referenced matter has been referred to this office for response.

  As experienced lawyers in the field of copyright, you are aware that the use of the image in the context it was used, in a blog post on a website devoted to photography and photographic techniques, in a non-commercial setting, where the author used it as an example of what he refers to as "combining," is unequivocally protected by fair use.

  "Notwithstanding the provisions of sections106 and 106A, the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright."17 U.S. Code §107.  See, among others, examples of photographic uses in  *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18 (1st Cir. 2000); *Katz v. Chevaldina*, No. 14-14525 (11th Cir. 2015); Clark v. Transportation Alternatives, Inc. 18 Civ. 9985 (VM) (S.D.N.Y. Mar. 18, 2019).

  While you pointed out your right to collect legal fees, you failed to mention the court typically imposes such on a plaintiff in limited cases, but also that your client can be found liable to our client for attorney's fees for bringing an action which should not have been brought or maintained. Moreover, your firm can be found liable for sanctions for bringing or maintain a copyright claim that is legally frivolous and if conduct of counsel is unreasonable and vexatious. 28 U.S.C. Section 1927.  See *Clark* for a

Higbee & Associates
August 25, 2020
Page 2

discussion concerning a law firm that was what some would refer to as a "copyright troll" and the court weighing whether to impose frivolous-filing sanctions on plaintiff's counsel for bringing numerous frivolous cases that "test the limits of the Court's presumption of good faith."

 We trust that your knowledge of fair use and review of the context in which the photo was used puts an end to this matter.

 This letter is not intended to constitute a complete recitation of all of our client's claims or a waiver of any rights our client may have with respect to the foregoing. Our client reserves all rights and remedies of every kind and nature with respect to the matters set forth herein.

       Sincerely,

       Greg S. Bernstein

GSB/jlk

cc: Terry McCarthy
  Stephen Lighthill

# Exhibit "D"

**From:** Theodore Sell tsell@higbeeassociates.com
**Subject:** Re: Copyright - American Society of Cinematographers - Howard Schatz - 556297
**Date:** August 28, 2020 at 9:57 AM
**To:** Josh Cannon jcannon@higbeeassociates.com
**Cc:** greg@thefilmlaw.com

Thank you Josh.

Mr. Bernstein,

Your reference of "copyright troll" and warning of frivolousness is both unprofessional and misplaced. There is no entrapment or litigation plans here; just copyright holders protecting their copyrights. It is sad that an organization that has many copyright holders among its members would so attack other copyright holders for protecting themselves when, conversely, a court would fault our clients for not having searched out potential infringements. I don't suppose your client's members allow others to take and use their works without permission under any and all circumstances?

As for Fair Use, first, it is a *defense*. What we do have here is a *prima facie* case for copyright infringement as such exists where a plaintiff can show (1) ownership of a valid copyright and (2) unauthorized use of constituent elements of the work that are original. See 17 USC 410(c) and *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). If there is a Fair Use defense to be made, it for you to make, not us.

Now that you have brought it up - though in severely truncated form, it is not clear to us that this use is Fair Use. This case is unlike in *Nunez* and *Katz*, where the stories were about thosee images and the actions shown *only* in those images, which made the images newsworthy. Here, these images are not essential to the story, merely illustrative, and therefore *not* Fair Use as "[u]sing a photo for the precise reason it was created does not support a finding that the nature and purpose of the use was fair." *BWP Media USA, Inc. v. Gossip Cop Media, Inc.* 196 F.Supp. 3d 395, 407 (S.D.N.Y. 2016) citing *Fitzgerald v. CBS Broadcasting, Inc.*, 491 F. Supp. 2d 177 (D. Mass. 2007) (finding a news outlet's use of a photojournalist's image of an arrest for the purpose of reporting on that arrest not transformative, as it used the photograph for the precise reason it was created). As there was no actual transformation, the use cannot be Fair.

Since you did not analyze the other three factors, neither do we except to point out your client's use fails those factors as well.

As such, this matter is not ended or closed - especially since your client continues to infringe the image. If your client wants to avoid litigation, including paying of Statutory Damages and our client's Attorneys' Fees - as well as other damages likely to be found in Discovery, it must cease the infringement and make restitution.

Theodore (Ted) W. Sell, Esq.
Colorado Bar No. 44157
Attorney at Law - Copyright Division
Law Firm of Higbee & Associates
1504 Brookhollow Dr. Suite 112
Santa Ana, CA 92705
mailto:tsell@higbeeassociates.com
Phone: (657) 229-6215

This electronic mail message and any attachment is confidential and may also contain privileged attorney-client information or work product. If you are not the intended recipient, or the person responsible to deliver it to the intended recipient, you may not use, disseminate, distribute or copy this communication. If you have received the message in error, please immediately notify us by reply electronic mail or by telephone and delete this original message. Thank you very much.

> On Aug 25, 2020, at 3:42 PM, Josh Cannon <jcannon@higbeeassociates.com> wrote:
>
> Mr. Bernstein,
>
> Thank you for your letter. I have Cc'd Attorney Theodore Sell here to review and respond to your claim of Fair Use.
>
> Thank you,
>
> Josh Cannon
> Claims Resolution Specialist - Copyright Enforcement Division
> Law Offices of Higbee & Associates (www.HigbeeAssociates.com)
> 1504 Brookhollow Dr. Suite 112,
> Santa Ana, CA 92705
> Direct: (714) 617-8341
> Office: (800) 716-1245
> Fax: (714) 597-6559
>
> Claims Resolution Specialists are non-attorney staff members who assist attorneys in attempting to resolve copyright claims prior to litigation. All correspondence is reviewed by staff attorneys.

# Exhibit "E"

